UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHEHNAZ KHAN,                          )
                                       )
            Plaintiff,                 )
                                       )
    v.                                 )   CASE NO. 1:06-cv-0766-DFH-TAB
                                       )
ELI LILLY AND COMPANY,                 )
                                       )
            Defendant.                 )

ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Shehnaz Khan worked for defendant Eli Lilly and Company as a biologist in Lilly's Lead Optimization Biology department from October 1999 until her termination in February 2005. Lilly has said it fired her for falsifying scientific data. Khan has maintained that she conducted her experiments according to Lilly's instructions and that she did not alter or falsify anything. She has sued Lilly for age, race, and national origin discrimination, claiming that Lilly treated her differently than her co-workers from the very beginning – transferring her more often, providing her with less training, failing to provide her with the ability to attend outside conferences and participate in meetings, failing to provide her with appropriate lab equipment, giving her more and more difficult work, paying her less, and finally terminating her. Khan brings suit under the Age Discrimination in Employment Act, 29 U.S.C. § 623, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.

Lilly has moved for summary judgment on all of Khan's claims.  The record is voluminous and the briefing is extensive.  This written decision is lengthy.  At first glance, it would be understandable to think that there must be a genuine issue of material fact somewhere in this mass of affidavits, depositions, documents, and briefs.  Khan has asserted repeatedly that Lilly has lied about her and the facts.  But upon close scrutiny – a review that pierces conclusions and labels, and instead demands admissible evidence – Khan's case breaks down.  She has no direct evidence of any animus against her based on age, race, or national origin.  There also is no "convincing mosaic" of evidence that would allow an inference of discrimination in Khan's termination.  Her indirect proof fails at the prima facie stage for lack of similarly situated employees, and there is no evidence that Lilly's expressed concern about falsifying research data when controls apparently had failed was a false pretext for illegal discrimination.  On a host of other issues she has raised, Khan has not shown with evidence any adverse employment actions or discriminatory animus.  As explained in detail below, therefore, Lilly's motion is granted in full.

*Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate when there are no genuine issues of material fact, leaving

the moving party entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).
The moving party must show that there is no genuine issue of material fact.  See
*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party need not
positively disprove the opponent's case; rather, it may prevail by establishing the
lack of evidentiary support for that case.  See *id.* at 325.  Where the non-moving
party bears the burden of proof on an issue at trial and the motion challenges that
issue, the non-moving party must set forth specific facts showing that there is a
genuine issue for trial.  See Fed. R. Civ. P. 56(e)(2); see also *Silk v. City of Chicago*,
194 F.3d 788, 798 (7th Cir. 1999).  Bare allegations not supported by specific
facts are not sufficient in opposing a motion for summary judgment.  *Hottenroth v.
Village of Slinger*, 388 F.3d 1015, 1027 (7th Cir. 2004), quoting *Hildebrandt v.
Illinois Dep't. of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003).

A factual issue is material only if resolving the factual issue might change
the suit's outcome under the governing law.  See *Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 248 (1986).  A factual issue is genuine only if there is sufficient
evidence for a reasonable jury to return a verdict in favor of the non-moving party.
See *id.*  In deciding a motion for summary judgment, a court may not assess the
credibility of witnesses, choose between competing inferences, or balance the
relative weight of conflicting evidence; the court must view all the evidence in the
record in the light most favorable to the non-moving party and resolve all factual
disputes in favor of the non-moving party.  See Fed. R. Civ. P. 56(c); *Anderson*,
477 U.S. at 255.

*Evidence Presented at Summary Judgment*

Khan and Lilly have argued quite different versions of the events and circumstances underlying Khan's case.  Each side supports its version with sworn affidavits and deposition testimony, and each side accuses the other of presenting evidence that, for various reasons, is inadmissible.  Pl. Response 6, 7, 8, 10, 11, 17, 18, 28 (evidence Lilly presented is "vague," "conclusory" or "self-serving"); Def. Reply at 2-4 (Khan's affidavit contains hearsay statements on which Khan has no personal knowledge and statements that contradict her earlier deposition testimony, and Khan opposes summary judgment with "vague and conclusory" statements).  To the extent that the parties' affidavits and other testimony in the record are specific and based on personal knowledge, they are competent evidence to support or rebut Lilly's summary judgment motion.  See *Dalton v. Battaglia*, 402 F.3d 729, 735 (7th Cir. 2005); *Dale v. Lappin*, 376 F.3d 652, 655-56 (7th Cir. 2004); *Payne v. Pauley*, 337 F.3d 767, 772-73 (7th Cir. 2003).  Where, however, the parties have presented nothing other than their own self-serving statements having no apparent basis in personal knowledge, the court has considered those statements as the subjective, unsupported beliefs of the parties but has not construed them as sufficient to raise genuine issues of material fact.  See *Witte v. Wisconsin Dep't of Corrections*, 434 F.3d 1031, 1036-37 (7th Cir. 2006); *Cooper-Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429-30 (7th Cir. 2004).  Likewise, where the parties have presented statements in sworn affidavits that directly contradict previous and specific sworn testimony of the same witness, the

later, contradictory affidavit statements ordinarily cannot raise a disputed fact. See *Beckel v. Wal-Mart Assoc., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002); *Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 736 (7th Cir. 2001); *Russell v. Acme Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995).

## *Facts for Summary Judgment*

In accord with the standard for summary judgment motions, the facts stated below are not necessarily true in an absolute sense, but they are either undisputed or reflect the admissible evidence in the light reasonably most favorable to Khan, as the non-moving party.  Facts adverse to Khan that Lilly has established beyond reasonable dispute are necessarily included.

## I.    *Lilly and the Lead Optimization Biology Department*

Eli Lilly & Co. is a global pharmaceutical manufacturing corporation headquartered in Indianapolis, Indiana.   Throughout her employment with Lilly, Khan worked in the Lead Optimization Biology ("LOB") Department.  The LOB laboratory was responsible for testing various compounds, analyzing the results, and forwarding the test results to project teams for further research and development.  Biologists in the LOB lab, including Khan, were responsible for running these experiments, called "assays," and analyzing the results.  Khan Dep. 21-22.

To set up an LOB assay, an employee filled small wells in 96-well "plates" with combinations of certain liquids. Kahl Aff. ¶ 7. The wells in an assay plate were arranged in eight rows and twelve columns. Some wells were reserved for test compounds and some wells were reserved for control compounds. Kahl Aff. ¶ 8. The control wells served as a standard for comparison and as a means of verifying the reliability of results obtained for test compound wells on a given assay plate. Kahl Aff. ¶ 9. When the control compounds behaved as expected, the results measured for the unknown material were considered reliable, but when the control compounds behaved unexpectedly, the results measured for the unknown compounds were considered unreliable for further research or analysis. Kahl Aff. ¶¶ 10-11.

Once an assay plate was prepared, it was inserted into various pieces of equipment that measured the interaction between the unknown test compound and the biological reagents. The equipment recorded its measurements in numerical form on a self-contained hard drive and networked storage drive according to instrument name. The measurements could be printed in a manner showing the numerical measurement assigned to each well on a plate using a networked computer and printer. Kahl Aff. ¶ 12. An employee then loaded the numerical measurements as recorded on the equipment from an assay run into computer analysis software known as ActivityBase or ABase. Kahl Aff. ¶ 13. In some cases, employees had to reorient the raw data generated by the instrument before loading it into Abase. If so, the reorientation had to be approved in advance

by the assay's development team and had to be documented appropriately.  Kahl Aff. ¶14.[1]

II.    *Khan's Work and Assignments in the LOB Department*

Khan, who is Asian and was born in India in 1959, began working for Lilly in 1999.  Although she spent her entire tenure at Lilly working in the LOB department and running and analyzing assays, she was transferred from project to project and from supervisor to supervisor within the LOB department.  When she joined Lilly she initially was assigned to work on the Glu recemase assay and was supervised by Jim McGee.  Khan Dep. 21.  Then, though still supervised by McGee, Khan was reassigned to the DNA ligase project.  Khan Dep. 23.  In March 2000 she left McGee's supervision and began working under Bob Campbell.  Khan Aff. ¶ 6.  Although she was supervised by Campbell instead of McGee, her work space and job duties did not change.  Khan Dep. 29.  The transfer meant that she had to start over to learn the new project.  Khan Dep. 30.  Khan asked Larry Stramm, the LOB Director, why she had been transferred from McGee's

---

[1]The parties disagree regarding how often data reorientation was necessary. Lilly asserts that reorientation occurred only "rarely."  Khan objects to the word "rarely" as vague and conclusory but does not offer her own estimate regarding how frequently reorientation occurred.  Def. Br. 4; Pl. Response 7-8.  Given that the parties agree, at least, that data reorientation did occur, any disagreement they have as to frequency is immaterial.  Likewise, Khan disputes that advance approval was required, apparently because she believed that her training was sufficient approval in this regard and that no further approval was necessary.  Pl. Response 7-8.  However, her citations to the record do not support her assertion that she held this belief and provide no support for Khan's disagreement with Lilly's testimony that it required advance approval before data could be reoriented. See Pl. Response 7-8, citing Khan Dep. 101, 156-63; Kahl Aff. ¶14.

supervision to Campbell's supervision.  She was informed that she was moved because other people came into McGee's group.  Khan Dep. 25.  Later Khan learned that the person who had moved from Campbell's group to McGee's group had been transferred because she had a problem with her former supervisor.  Khan Dep. 26; Khan Aff. ¶ 6.  Khan felt that she had been used as a "spare part."  Khan Dep. 28.

Khan remained under Campbell's supervision for approximately the next eight months to a year.  Khan Dep. 30.  For three to four months of that time she was a "loaner" to an LOB project supervised by John Zgombick.  During this period Khan spent two days a week in Zgombick's group and three days a week in Campbell's group.  Khan Dep. 30-32.  Again she had to adjust to new co-workers and she had to learn the new assay.  Khan Dep. 31.  She found the assay to be tedious, and she had to walk to a different building on the days she reported to Zgombick's group.  *Id.*  Khan was not told and did not know why she was chosen to be loaned to Zgombick's group.  Khan Dep. 31.

While working for Campbell and as a loaner in Zgombick's group, Khan felt she was treated as an outsider and not as part of the team.  She believed that her notebooks were checked more often than her co-workers' notebooks were checked, and that she did not receive help when she needed it.  Khan Dep. 33.  She felt she was not given direction with her new assays.  *Id.*  Also, she had to dilute her assays by hand because there was no automation to assist with set-up in

Campbell's assay group and she developed "trigger finger and carpal tunnel." Khan Dep. 31-32. These conditions later resolved. Khan Dep. 86-87.

The "loaner" arrangement ended when the project ended. Khan Dep. 32-33. In February or March 2002, Khan was transferred back to McGee's supervision. Khan Aff. 9. She was not informed why she was being transferred. Khan Dep. at 34. On McGee's project, the Factor VIIa assay, Khan again had to set up the assay plates by hand rather than with a robot arm because the formula she was working with could not be used with the automatic robot. Khan Dep. at 42-43. Though her primary assignment was to McGee's group, for six to eight months of this time she again worked as a loaner in Zgombick's group on the MC4 assay. Khan Dep. 34-35. She was told she was being loaned to Zgombick's group because they needed the help. Khan Dep. 35.

As she had in Campbell's group, in Zgombick's group Khan felt she was treated as an outsider and was not acknowledged. Khan Dep. 36, 40-41. For one thing, she was excluded from Zgombick group team meetings. Khan Dep. 81. She also observed that other members of Zgombick's group were permitted to go to conferences. When Khan asked if she could attend, Khan was told that she could not go because of budget constraints. Khan Dep. 36-40; Khan Aff. ¶¶ 20-22. She believed that the employees whom she observed attending conferences, Amy Porter, Dana Fastenau, Ryan Favors, Brian Anderson, Jack Estridge, and Wendy Gough, were all Caucasian and under 40 years old. Khan Aff. ¶¶ 23-24. She was

not told and did not know why these other employees were chosen to attend conferences while she was not.  Khan Dep. 38-39.

Khan believed that projects in the Lilly LOB department typically lasted between one and three years.  Khan Dep. 43.  When a project ended, the biologists working on that project would be reassigned but generally would stay with their teams.  Khan Dep. 43-44;  Khan Aff. ¶ 15.  Khan believed that was not the case with her and that instead of being assigned to stay with her team, she was being transferred from team to team.  Khan Dep. 44.  Khan acknowledged that it was not uncommon for assays to be transferred, but she believed that she was the one chosen to be dislocated whenever the LOB team needed something.  Khan Dep. 35.  She believed that no one else in the LOB department was transferred as many times as she was, estimating that some of her co-workers may have been transferred once or twice but most stayed in their groups.  Khan Dep. 74; Khan Aff. ¶ 14.  She did not know if other employees in the LOB department were ever loaned to other groups to help with projects.  Khan Dep. 35.  She believed that moving from one supervisor to another and from one project to another hindered her professional development because she was required to start again with new groups, assignments, and supervisors.  Khan Dep. 39; Khan Aff. ¶¶ 17-18.

III.   *Khan's Work on the GRA Project*

Khan stayed on McGee's VIIa project about a year, and then was transferred to the glugogen receptor antagonist ("GRA") project. Initially, although her assay assignment had changed, she was still supervised by McGee. In May or June 2004, Steve Kahl began supervising Khan on the GRA assay. Khan Dep. 47. When she was assigned to the GRA assay, she was trained by Becky Owen. Khan Dep. 51. Owen was a fellow biologist. She was one or two personnel levels above Khan and was from a different department. Khan Dep. 51.

On the GRA project, Khan prepared multiple 96-well plates, each of which contained twelve columns (designated 1 to 12) and eight rows (designated A to H) of wells. Row A in columns 1 to 11 was filled with a known compound, biological reagents, and buffer. Rows B through H in columns 1 through 11 were to be filled with the unknown test compound, biological reagents, and buffer. Column 12 of rows A through D was filled with buffer only, and these wells were referred to as the "maximum" (or "max") controls. Column 12 of rows E through H was filled with buffer, biological reagents, and a known compound, and these wells were commonly referred to as the "minimum" (or "min") controls. Khan Dep. 155; Kahl Aff. ¶ 17.

Once Khan prepared the GRA plates, she loaded them into spectrophotometry equipment, called a "TriLux," that measured light emissions. The TriLux recorded on an internal hard drive the numerical values for each well in a plate and each plate in a run. Kahl Dep. 29; Khan Dep. 92-93; Kahl Aff. ¶ 18.

When Khan observed that the "max" and "min" values of Column 12 of one of her assay plates had failed, Khan did as she testified she had been trained to do.  Khan Aff. ¶ 36.  Because Column 12 contained only known agents and not a test compound, she copied Column 12 values from a previous run (and from a different plate) into the data she entered into the analysis software.  Khan Dep. 91-93, 156.  She did not copy values for the other columns on the plate because those columns contained the unknown compound being tested.  Khan Aff. ¶ 45. She asserts she did not discard, alter, or attempt to hide the failed data.  Instead, she saved that data on the LOB server in a renamed folder.  Khan Dep. 92; Khan Aff. ¶ 39.  That data remained on the TriLux (the instrument that initially analyzed the assay plates).  Khan Dep. 92-93, 156; Khan Aff. ¶ 38.

Khan then proceeded to analyze the 96-well plate using the analysis software (ABase) with the Column 12 values copied from a different run instead of the original values generated by the TriLux.  Khan Dep. 155-59, 168-69.  Khan remembered copying the "max" and "min" values from one plate to another on two occasions.  Khan Dep. 155.  She believed that if she had not copied the Column 12 values, the result would have been "garbage in and garbage out."  Khan Dep. 158.

In late January or February 2005, Khan was assigned to four assays.  Khan Dep. 70-71.  She believed her co-workers usually were assigned to two or three assays.   Khan Dep. 71-73.  Some assays were more complicated than others.

Khan did not know how her assays compared to those of other biologists reporting to Kahl.  Khan Dep. 71.  In any event, Khan asked Kahl for help with her workload, but Kahl did not like the idea.  He told Khan it would be better if she did the work herself.  Khan Dep. 70.  Then, Khan was assigned a fifth assay because one of her co-workers, Amy Porter, was discovered loading erroneous data into ABase for analysis.  Khan Dep. 71.  Khan's workload prevented her from taking a lunch break.  She missed medical appointments and worked weekends, which she believes other biologists did not have to do.  Khan Dep. 167; Khan Aff. ¶ 32.  One of the chemists on the GRA project, Guxion Zhu, asked Khan why Kahl had loaded her up with so many assays.  Khan Dep. 165-66; Khan Aff. ¶ 29.  Zhu told Khan he was concerned that Khan's turnaround times would be affected.  Khan Dep. 166.  When Khan spoke to Kahl about what Zhu said, Kahl said that it was none of Zhu's business.  Khan Dep. 166.

IV.   *Lilly's Investigation of Khan's Work and Khan's Termination*

In February 2005, a chemist reported to Kahl that she believed the ABase activity Khan reported for a test compound was inconsistent and that certain molecules Khan reported as active should have been inactive.  Kahl Dep. 102; Kahl Aff. ¶ 20.  Kahl investigated and discovered that Khan had selected an old data file from a January run, analyzed it in ABase, and reported as though it was a current February file.  Khan Dep. 102-03; Kahl Dep. 13, 72; Kahl Aff. ¶ 21.

Kahl also noticed that two of the plates Khan reported in the file had identical control values in Column 12. This result was scientifically unlikely, if not impossible. Kahl Dep. 72-73; Kahl Aff. ¶ 22.[2] After comparing the values for the January file on the TriLux with the values saved for the January file in Khan's network folder and the values Khan reported into ABase, Kahl concluded that Khan had changed the values for Column 12 on the later plate prior to loading the information for both plates into ABase for analysis. Kahl Dep. 7-10, 115-17; Kahl Dep. Ex. 12. The January file saved on the TriLux – the "raw" data – indicated that the Column 12 compound, the control for the plate, had failed. As a result, the entire plate should have been failed. Instead, Khan had deleted the Column 12 control values of the failed plate and replaced them with different Column 12 control values from a different plate. She then loaded the plate results, including the copied data for Column 12, into ABase for analysis. Khan Dep. 92-94, 168-69; Kahl Aff. ¶¶ 23-25.

_____

[2]In her deposition, Khan testified that Column 12 values would be within a range but not identical. Khan Dep. 126-27. Then, in an affidavit submitted in support of her Response to Lilly's summary judgment brief, Khan asserted that the Column 12 values "had to be the same, because they consisted of the same known substances," and that "the buffer and the known compound in Column 12 were the same on all eight plates in the same run." Khan Aff. ¶¶ 41, 44. Lilly asserts that the court should disregard the statements in Khan's affidavit because they contradict her earlier deposition testimony. Although the court agrees that these statements are contradictory, the court disregards the statements for a different reason – they are immaterial. Khan's theories on research methods and outcomes may shed light on why she did what she did, but they do not bear on Lilly's expectations concerning Khan's research methodology and the veracity and reliability of the results of that research.

On February 22, 2005, Kahl called Khan into his office.  Khan Dep. 91.
Kahl told Khan that she had used the wrong file for the February 10, 2005 run.
Khan Aff. ¶ 46.  He asked if she had copied the control data from one plate to
another in Column 12.  Khan explained that she had because the control data in
Column 12 had malfunctioned and the control was the same known compound
as in all other plates for Column 12.  Khan Dep. 91; Khan Aff. ¶ 47.  This was the
first time Kahl spoke to Khan about the procedure for the GRA assay.  Khan Aff.
¶ 62.  Though Khan believed that other employees in the LOB department (Becky
Owen on the GRA assay, Saba Husain on the glucagon cyclic AMP assay, and
Cathy Vlasek on the 11 beta HSD assay) had done the same thing, she did not
talk to Kahl about these other employees' practices when he confronted her on
February 22nd.  Khan Dep. 95-99.

Kahl discussed the situation with LOB Director Larry Stramm and Human
Resources Representative Jean Labus.  Kahl Dep. 77, 79-81.  On February 23,
Jean Labus talked to Khan about what she had done.  Khan Dep. 100.  Khan told
Labus that she had not hidden or falsified any data.  Khan Dep. 101.  She had
copied the data as she had learned from her trainer.  *Id.*  Khan told Labus that
she had observed and learned the procedure while training on the 11 Beta HSD
project and the Cyclic AMP project, but did not name the other employees that she
had seen also copying Column 12 values from one plate to another.  Khan Dep.
102; Khan Aff. ¶ 77.  She believed that Lilly knew who she had worked with on
those projects.  Khan Aff. ¶ 77.  After interviewing Khan, Labus concluded that

Khan's actions constituted falsification in violation of Lilly policy.   Labus recommended Khan's termination.  Kahl Dep. 83-85; Labus Aff. ¶¶ 8-10.  Labus' recommendation was approved by human resources and by Stramm and Kahl in the LOB.

On February 24, 2005, Stramm, Labus, and Kahl came to Khan's office. Khan Dep. 106-07.  Labus informed Khan that she was being terminated.  Khan Dep. 107.  Khan explained that she had not changed any primary data and that the primary data was still intact and available on the Trilux machine.  *Id.*  Khan told Stramm, Labus and Kahl that other employees had committed similar infractions.  Khan Dep. 116.  She named the particular projects those employees had worked on, but she did not provide the names of the individuals.  Khan Dep. 116; Khan Aff. ¶ 77.  Kahl responded that those were different assays.  Khan Aff. ¶ 77.  Labus asked Stramm if the information Khan provided changed Stramm's decision or if Stramm would like to investigate the LOB laboratory, but Stramm declined.  Khan Dep. 107.

Although Kahl believed Khan's practice of copying Column 12 values was a "misunderstanding," Kahl did not work with Khan to attempt to correct her performance or behavior before her termination.  Kahl Dep. Ex. 6; Khan Aff. ¶¶ 65-66.  Though Khan understood that data falsification was grounds for immediate dismissal from Lilly, she believed that what she did was not falsification because the primary data remained in the Trilux machine, and she

did not invent any data.  Khan Dep. 118-19, 159;  Labus Aff. ¶ 5.  To Khan, "falsification" meant something deliberate and fraudulent.  Khan Dep. 159.

V.     *Khan's Co-Workers*

Khan believed that two Lilly employees, Amy Porter and Ryan Favors, had falsified data but were not discharged.  Khan Dep. 119-124.  She also believed that employees (Favors, Rick Zink, and Dana Fastenau) with less seniority were promoted when she was not.  Khan Dep. 145-47; Khan Aff. ¶ 79.

A.     *Amy Porter*

Amy Porter worked in Khan's group in the LOB department.  In August 2004, Amy Porter was found to be loading a lot of erroneous data into ABase. Khan Dep. 121, 137; Khan Aff. ¶ 27.  Khan and Saba Husain, another biologist in the LOB department, were assigned to redo the assays in question, and Porter was transferred to McGee's group.  Khan Dep. 71-72, 121-22, 137; Khan Aff. ¶ 27. Khan did not know why Porter was reporting erroneous data, did not know if Porter was changing data, and did not know what the problems were with Porter's data.   Khan Dep. 122-23, 137-38.   However, Khan believed that uploading erroneous data was "much worse" than copying data derived from a known control compound from one plate to another.  Khan Aff. ¶ 88.  Khan did not tell anyone in Lilly management about the problems with Porter's data.  Khan Dep. 122.

On an unspecified number of occasions, Khan observed Amy Porter going to lunch with Joyce Boadt, a manager in the LOB department.  Khan Dep. 76-77; Khan Aff. ¶ 25.  Khan believed those to be mentoring lunches, though she did not know.   Khan Dep. 76-77.   Also, Porter was allowed to represent the LOB department at managers' meetings either with Boadt or in Boadt's place even though Porter had been hired after Khan and Khan had trained Porter on the MC4 project.  Khan Dep. 78-79; Khan Aff. ¶ 26.  Khan believed Porter was chosen to

attend the managers' meetings because she was younger and Caucasian.  Khan

Dep. 78.[3]


      B.    *Ryan Favors*

After Khan was terminated, one of her former co-workers (Saba Husain) told

Khan that another of Khan's former co-workers (Anju Patel) had told Husain that

Ryan Favors had pulled the historical data for the positive control from an old

compound week after week.  Khan Dep. 88-90, 120-21.  Khan believed that using

"historical data" was "much worse" than copying data derived from known control

compounds from plate to plate as Khan had done.  Khan Aff. ¶ 87.  Husain told

Khan that Patel approached Kahl and asked him why Khan had been fired when

she believed Favors had committed a similar act.  Khan Dep. 88-90, 136-37.[4]


Over a year earlier, Kahl had noticed that Favors was using a method of

analysis on an assay that was scientifically acceptable, but that was not the

method Kahl preferred.  Kahl Dep. 120-24; Kahl Aff. ¶ 35.  Favors had not

---

[3]In the foregoing paragraph and other portions of this statement of undisputed facts, the court has cited Khan's beliefs about others' actions and intentions.  Her beliefs are not evidence, of course, but the court has included these statements to show matters as to which Khan relies on her own beliefs without support from competent evidence.

[4]The foregoing paragraph is obviously full of hearsay (of multiple layers) that is not admissible to show a genuine issue of material fact, as well as Khan's subjective beliefs, which also are not competent to show a genuine issue of material fact.  The court notes these particular instances of this problem merely by way of illustration of a systemic problem in the plaintiff's evidence.

changed the values of any column of his assay plates.  Kahl Dep. 121.  He took a daily average of the agonist control and used that average as a constant divisor when he performed his analysis of the raw data.  Kahl Dep. 121-22; 124.  Favors was hired after Khan, but Khan observed that he was promoted from Level J to Level K after about two years in the LOB department.  Khan Aff. ¶ 79.

       C.    *Rick Zink*

Khan believed that Rick Zink was hired after she was but was promoted from Level J to Level K within two years of his hire.  Khan Dep. 145.  Khan testified regarding her assumption that once an employee was promoted, that employee received a pay increase.  Although Khan did not know how much Zink was paid or what his starting salary was, "he went to the level up."  Khan Dep. 146.  She had no information regarding Zink's performance and did not know how Zink was evaluated.  Khan Dep. 147.  Khan knew that her own performance had been rated as "successful" and that in each of her evaluations she had been marked as "eligible – based on performance employee will be considered for merit increase."  She did not know how her performance compared to other employees.  Khan Dep. 149.

D.   *Dana Fastenau*

Khan did not know how much Dana Fastenau was paid, but she believed it was "common knowledge" that employees who received a promotion made more money.  Khan Dep. 146.  Khan did not know what Fastenau's starting salary was. Khan Dep. 146.  She believes that Fastenau was promoted from Level J to Level K within two years of her hire. Khan Aff. ¶ 79.  Khan had no information regarding Fastenau's performance, did not know how Fastenau was evaluated, and did not know how her performance compared with Khan's ratings.  Khan Dep. 147, 149.

VI.   *Post-Termination Events*

Khan believed that after she was terminated, Lilly issued detailed guidelines to the LOB department for handling maximum and minimum values, although she did not know exactly when or why.  Khan Dep. 114-15.  Lilly also instituted a two-day course to teach LOB associates how to optimize and validate assays statistically according to the guidelines.  Kahl Dep. 43-44.  The guidelines and training pertained to omitting data from the analysis of the raw data, not changing or substituting different values.  Kahl Dep. 44-46; Kahl Aff. ¶ 33.

In March 2005, Khan telephoned Lilly's Human Resources department to discuss her termination.  Khan Dep. 127-28.  She questioned Lilly's use of the word "falsification," explaining that she believed that what she had done was not falsification.  She had copied values from one plate to another, but believed that

those values only served as background to normalize the test compounds and did not involve any test compounds themselves. Khan Dep. 128. She told the Lilly human resources representative that she had received no warning prior to being terminated. *Id.* Khan was informed that because Lilly had found that she had falsified data, she was not entitled to a warning before being terminated. *Id.* Khan informed the HR representative that she believed other employees were doing what Khan had done. When asked to provide the names of those employees, Khan refused. *Id.*

In response to a letter sent by Khan's attorney, Kim Peterson of Lilly's Human Resources department wrote to Khan in May 2005, telling her that Lilly was not aware of any other person in the lab who had engaged in actions similar to those that led to Khan's termination. Khan Dep. 142; Khan Dep. Ex. 8. Peterson invited Khan to share specific information about other employees, but Khan did not contact Peterson or anyone else in response to the letter. Khan Dep. 142-43; Khan Dep. Ex. 8.

VII.    *Khan's EEOC Charge and Complaint Allegations*

On August 17, 2005, Khan filed a charge of discrimination with the Equal Employment Opportunity Commission alleging that she had been terminated on the basis of her age and national origin. Khan Dep. Ex. 9. In her EEOC charge, Khan stated that at the time of her termination she informed Labus and Kahl that,

although she was being terminated for falsification of data, the guidelines and training she had received had not been specific enough to provide her with direction, and she frequently had observed her co-workers engaging in similar practices during training.  She alleged that other employees had committed similar offenses but had not received discipline, naming Amy Porter and Ryan Favors.

Lilly responded to Khan's EEOC charge.  Among other information Lilly provided in its response, it advised the EEOC that Khan had received direct coaching regarding inappropriate laboratory practices, that she had been instructed regarding proper laboratory practices, and that Khan chose to ignore those warnings.  Khan Aff. Ex. 1 at 3.  Khan asserted that the Lilly employee who responded to her EEOC charge was lying on these points.  Khan Aff. ¶¶ 59-61.

Khan then brought suit.  In her lawsuit, she claimed that she had been transferred more than other employees, had not received the same training and mentoring as other employees, had not been permitted to attend professional conferences or participate in meetings, was not given appropriate lab equipment, was given more difficult work than other employees, was paid less than other employees, and was terminated.  Complaint ¶¶ 8-16.

In her brief in response to Lilly's summary judgment motion, Khan asserts that she was not promoted from Level J in the five years that she was employed

at Lilly, although her co-workers were promoted within two years.  Pl. Response 22-23; Khan Dep. 145-151;  Khan Aff. ¶ 79.  She observed that Rick Zink, Dana Fastenau, and Ryan Favors were promoted from Level J to Level K after about two years after they started working in the LOB department.  Khan Dep. 145-151; Khan Aff. ¶ 79.  These employees were Caucasian and "much younger" than Khan. Khan Aff. ¶ 79.  She asserts that she was not promoted in spite of the fact that she always received a performance rating of "Eligible – based on performance, employee will be considered for merit increase," and that she had spoken with her supervisors who did not give her any reason to explain why she was not promoted. Kahl Dep. Exs. 1-3; Khan Dep. 147-48.

*Discussion*

The case presents a host of legal issues.  The court addresses first the legal consequences of the fact that Khan's EEOC charge of discrimination addressed only her termination and omitted any reference to the many other subjects she has raised in her complaint and summary judgment brief.  Second, the court outlines briefly the methods of proof applicable to Khan's remaining claims. Third, the court addresses Khan's § 1981 claims challenging her treatment on the job before she was fired.  Fourth, the court addresses Khan's claims of age, race, and national origin discrimination in her firing, considering different modes of proof.

I.      *Administrative Exhaustion and the Scope of Khan's ADEA and Title VII Claims*

Under Title VII and the ADEA, many of Khan's allegations are either untimely or beyond the scope of her EEOC charge.  In her EEOC charge, Khan complained only of her termination.  She claimed that she was terminated for falsifying data, although she had not received specific guidelines or sufficient training, and that two of her under-40 Caucasian co-workers, Amy Porter and Ryan Favors, had committed the same offense and were not terminated.  Khan Dep. Ex. 9.  In her amended complaint filed in this court, Khan raises Title VII and ADEA claims in addition to the termination claim she brought before the EEOC. She claims that she was transferred more frequently than her co-workers, that she received less training and mentoring than her co-workers, that she was not provided the same opportunities to attend professional conferences and participate in meetings as her co-workers, that she was not provided appropriate lab equipment, that she was given more, and more difficult, work than her co-workers, and that she was paid less than her co-workers.  Complaint ¶¶ 8-16.[5]

Under Title VII and the ADEA, a plaintiff is required to exhaust her administrative remedies by filing a charge with the appropriate federal or state agency before proceeding to court.  See 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d); *Dandy v. United Parcel Service, Inc.*, 388 F.3d 263, 270 (7th Cir. 2004)

---

[5]Because Khan treats her allegations that she was not provided the same opportunities to attend professional conferences or participate in meetings as her co-workers as evidence in support of her broader "failure to train or mentor" claim (instead of stand-alone discrimination claims), the court has done the same.

(Title VII); *Ajayi v. Aramark Business Services, Inc.*, 336 F.3d 520, 527 (7th Cir. 2003) (ADEA).   The charge filed with the agency will limit the claims the complainant may raise in litigation, as the court will only hear claims that are included in the EEOC charge or that are reasonably related to the allegations of the charge.   See *Doe v. Oberweis Dairy*, 456 F.3d 704, 708-09 (7th Cir. 2006); *Dandy*, 388 F.3d at 270; *Ajayi*, 336 F.3d at 527.

The charge also must be timely.   In Indiana, charges with the Equal Employment Opportunity Commission must be filed within 300 days of the event that gave rise to a Title VII claim, and within 180 days of the event that gave rise to an ADEA claim.   See 29 U.S.C. § 626(d)(1);  42 U.S.C. § 2000e-5(e)(1);  *Dandy*, 388 F.3d at 270 (Title VII); *EEOC v. North Gibson School Corp.*, 266 F.3d 607, 617 (7th Cir. 2001) (ADEA), abrogated on other grounds, *EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002).   Khan filed her EEOC charge on August 17, 2005.   The 300 days preceding Khan's EEOC charge commenced on October 21, 2004.   Any claim Khan may bring based on Title VII race or national origin discrimination occurring after that date is timely.   The 180 days preceding Khan's EEOC charge commenced on February 18, 2005.   Any claim Khan may bring based on ADEA age discrimination occurring after that date is timely.

Khan's claim that her termination was illegal under Title VII and the ADEA is both timely and properly within the scope of her EEOC charge.   Lilly argues that all of Khan's other allegations of discriminatory treatment – her frequent transfers,

her training and mentoring, her equipment assignment, her comparative workload, and her pay – are barred under these statutes as both untimely and beyond the scope of her EEOC charge.  The court agrees that Khan's allegations of frequent transfers and improper equipment stem from events that occurred prior to July 2004, when Steve Kahl began supervising Khan.  Those claims predate her EEOC charge by more than 300 days and are time-barred under both Title VII and the ADEA.  Likewise, Khan's claims that she received less training and mentoring, was subject to a greater workload, and was paid less than her comparative co-workers are time-barred to the extent they are based on events occurring prior to October 21, 2004 (for Khan's Title VII claims) and February 18, 2005 (for her ADEA claim).[6]

Khan's EEOC charge, in which she raised her termination but none of these other allegedly discriminatory acts (transfers, training and mentoring, equipment assignments, workload, and pay) effectively limits the claims she may now bring

---

[6]In *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, ___ U.S. ___, ___127 S. Ct. 2162, 2167-72 (2007), the Supreme Court held that discriminatory pay claims are triggered by the discriminatory pay decision itself, not later non-discriminatory payments that allegedly perpetuate the effects of earlier decisions.  Thus, to bring a timely discriminatory pay claim under Title VII or the ADEA based on the promotions of her co-workers, Khan would have had to file a charge with the EEOC no later than 300 days after her co-workers were promoted and she was not.  Lilly argues that Khan bases her claim of disparate pay on disparities caused by promotions of her co-workers that occurred prior to July 2004, when Kahl began supervising Khan.  Def. Br. 14.  However, Lilly provided no evidence to support its assertion that Khan's co-workers were promoted prior to July 2004.  Without competent evidence on the point, the court will not bar this claim for timeliness.  For purposes of summary judgment, the court presumes that these individuals were promoted within the 180/300 day windows covered by Khan's EEOC charge.

under Title VII and the ADEA.  Even if her non-termination claims were timely, they could not be brought as stand-alone claims for discrete acts of discrimination without a showing that they are "reasonably related" to her allegation that she was illegally terminated under the ADEA and Title VII.  See *Dandy*, 388 F.3d at 270 (court will only hear claims that are included in an EEOC charge or that are "reasonably related" to the allegations of the charge); *Ajayi*, 336 F.3d at 527 (same).

This is meant to be a liberal standard, but not so liberal as to write the administrative exhaustion requirement out of the statutes.  Claims are considered "reasonably related" if there is a factual relationship between them.  See *Ezell v. Potter,* 400 F.3d 1041, 1046 (7th Cir. 2005); *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1118 (7th Cir. 2005).  At a minimum, this means that the EEOC charge and the allegations in the complaint must describe the same conduct and implicate the same individuals.  See *id*.  Khan argues that her transfers, training, equipment, workload and pay were "part of the harassment which culminated" in her termination (Pl. Response 26), that these events were part of a "pattern of discrimination" (Pl. Surreply 12) and that Lilly (as opposed to a specific individual) was the discriminating party implicated in each of these allegations (Pl. Surreply 12).  This is not enough.  Khan has not shown any discernable commonality between her termination and her transfers, training, equipment, workload or pay, much less that these events describe the same conduct and implicate the same

individuals.  She may not raise these events as discrete Title VII or ADEA claims before this court.

Khan argues that *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), applies and would permit this court to reach the merits of her Title VII and ADEA claims of discriminatory transfers, training and mentoring, equipment provision, workload, and pay in spite of her failure to raise these events in her EEOC charge because these acts provide "background evidence" to the "harassment which culminated in [her] termination." Pl. Response 26.  *Morgan* recognized an exception to the 300-day limit for hostile work environment claims, holding that the entire time period of the hostile environment may be considered, provided that an act contributing to the claim occurs within the filing period.  See *Morgan*, 536 U.S. at 117; see also *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 769-70 (7th Cir. 2007) (ordering new trial in hostile environment case where relevant evidence from outside filing period was excluded).  But Khan does not claim that she suffered from a hostile work environment.[7]

---

[7]The word "harassment" can have legal import, and Khan uses the word on one occasion in her response brief.  Khan has not raised a hostile work environment claim at any stage of this litigation, nor does she argue otherwise. See Pl. Response 26 (Khan's transfers, training, equipment, workload and pay "are part of the harassment which culminated in the termination of plaintiff"); see also *Sitar v. Indiana Dep't of Transportation*, 344 F.3d 720, 726 (7th Cir. 2003) (plaintiff not permitted to pursue hostile work environment or sex discrimination claim when she only alleged retaliation in her EEOC charge).

Where, as here, a plaintiff has not claimed to have worked in an environment that was hostile based on race, sex, age, or any other prohibited basis, the *Morgan* Court enforced the rule that discrete discriminatory acts are not actionable if time-barred, even when they are related to timely charges.   536 U.S. at 113.   Specifically, the *Morgan* Court noted that acts such as termination, failure to promote, denial of transfer, or refusal to hire are each discrete acts that "occur" when the discriminatory decision is made, and are actionable only if the victim files a charge with the EEOC within the statutory time limit.   *Id.* at 114.   The Supreme Court in *Morgan* acknowledged that events outside the 300-day time limit may constitute "relevant background evidence," but only in cases where the status of a current practice is at issue or in cases where a present violation exists, not in cases where the only connecting thread is continuity of employment.   See *Morgan*, 536 U.S. at 112-13.

To illustrate this distinction, the *Morgan* Court reviewed *United Air Lines v. Evans*, 431 U.S. 553 (1977).   United forced Evans to resign because of its policy against married female flight attendants.   Evans failed to file a timely charge after her separation but claimed that United was guilty of a present, continuing violation of Title VII because when she was rehired, the seniority system failed to give her credit for her prior service.   Though the Court concluded that her discriminatory resignation claim was time-barred, it noted that "it may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue."   *Evans*, 431 U.S. at 558.   Looking to *Evans*, the *Morgan* Court

found that although an employee is not barred from using prior acts as background evidence to support a timely claim, the employee could not use a termination that fell within the limitations period to pull in a time-barred discriminatory act.  Accordingly, Khan would not be legally barred from presenting relevant evidence of these other events to a jury tasked with determining whether her *termination* was discriminatory under Title VII or the ADEA, but she is procedurally barred from proceeding on independent, discrete claims of Title VII or ADEA discrimination based on her transfers, training, equipment, workload or pay.

II.   *Methods of Proof for Discrimination Claims*

Khan brings forward identical claims of race and national origin discrimination under § 1981, however.  Unlike Title VII and the ADEA, claims brought under § 1981 are governed by the four-year statute of limitations in 28 U.S.C. § 1658 and are not limited by any administrative filing prerequisites. See *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004).  Khan therefore may pursue claims under § 1981 based on the discrete acts unrelated to her termination that she may not pursue under Title VII or the ADEA:  her transfers, the amount of training and mentoring she received, her equipment assignments, her comparative workload, and her pay.

A plaintiff bringing an employment discrimination claim under the ADEA, Title VII, or § 1981 may prove her claim using either or both the "direct" and "indirect" methods of proof.  See *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003).  Khan relies on both methods of proof to oppose Lilly's motion for summary judgment.

Under the direct method of proof, Khan may show, by way of direct or circumstantial evidence, that Lilly's decision to take an adverse job action against her was motivated by an impermissible purpose – here, that impermissible purpose would be her age, race, or national origin.  See *Cerutti*, 349 F.3d at 1061. Direct evidence is evidence that, if believed by a trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption, and essentially "requires an admission by the decision-maker that his actions were based upon the prohibited animus." *Id.* at 1061.  Khan can also prevail under the direct method of proof by constructing a "convincing mosaic" of circumstantial evidence. *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).  The circumstantial evidence brought forward must "point directly to a discriminatory reason for the employer's action" and must be sufficient to allow a jury to infer intentional discrimination by the decision-maker. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003); see also *Troupe*, 20 F.3d at 736.  Khan asserts that her claims survive summary judgment by way of circumstantial evidence.

Khan may also rely on the indirect method, under which she must first come forward with evidence sufficient to satisfy the elements of a prima facie case of discrimination.  To establish her prima face case, Khan must show that:  (1) she is a member of a protected class; (2) her performance met Lilly's legitimate expectations; (3) she was subject to an adverse employment action; and (4) her employer treated more favorably other employees who were similarly situated but did not share Khan's protected characteristic.  See *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007)  (indirect method in a Title VII and §1981 case); *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 492 (7th Cir. 2007) (indirect method in an ADEA case).  If she succeeds in this showing, Lilly may rebut her case by articulating a legitimate, non-discriminatory reason for the employment action.  See *id*.  If Lilly satisfies this burden, the burden shifts back to Khan to present evidence that could allow a reasonable jury to find that Lilly's stated reason was not a true reason but was a pretext that would permit an inference of illegal discrimination.  See *id*.

Khan points out that, regardless of how evidence is described or organized, ultimately the court must consider the evidence as a whole without "pigeonholing."  See *Simple v. Walgreen Co.*, 511 F.3d 668, 671 (7th Cir. 2007).  This is true, of course, but an employment discrimination plaintiff must still meet her burden of coming forward with evidence that would allow a reasonable jury to find that she was the victim of unlawful discrimination.  *Simple*, 511 F.3d at 671, citing *Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 159 (7th Cir. 1996) ("The

question instead is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground. . . .  Any demonstration strong enough to support a judgment in the plaintiff's favor if the employer remains silent will do, even if the proof does not fit into a set of pigeonholes.").  In opposing summary judgment, a party must make this showing with evidence that would be admissible before a jury.

III.    *Khan's Section 1981 Claims of Discriminatory Transfers, Training, Equipment, Workload, and Pay*

Khan may pursue her claims of discriminatory transfers, training and mentoring, equipment, workload, and pay under §1981, but she must present competent evidence that would allow a reasonable jury to find that she suffered a materially adverse employment action that resulted from the alleged discrimination.  See *Lewis v. City of Chicago*, 496 F.3d 645, 652-53 (7th Cir. 2007), citing *Rhodes v. Illinois Dep't of Transportation*, 359 F.3d 498, 504 (7th Cir. 2004) ("Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action.").

Although the concept is broadly defined, "not everything that makes an employee unhappy is an actionable adverse action."  *Lewis*, 496 F.3d at 653, quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000).  To be actionable, the employment action "must be a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibility, or a decision causing a significant change in benefits." *Id.* The Seventh Circuit has categorized materially adverse actions into three general groups involving:  (1) the employee's current wealth such as compensation, fringe benefits, and financial terms of employment, including termination; (2) the employee's career prospects, thus affecting the employee's future wealth; and (3) changes to the employee's work conditions including subjecting her to "humiliating, degrading, unsafe, unhealthy, or otherwise significant alteration in [her] workplace environment."  See *Lewis*, 496 F.3d at 653, citing *Herrnreiter v. Chicago Housing Authority*, 315 F.3d 742, 744-45 (7th Cir. 2002).

A.    *Transfers*

Khan argues that her transfers were adverse employment actions.  This would be so only if the transfers were demotions, resulted in a loss of pay, or significantly reduced her career prospects by preventing her from using her skills and training.  See *Herrnreiter*, 315 F.3d at 744.  Khan has not presented any competent evidence sufficient to demonstrate that these transfers amounted to a demotion in form or substance.  Her pay, workspace, and job responsibilities remained essentially the same from one assignment to the next. She does not allege any loss in pay resulting from the transfers, and her job title remained the same.  Khan speculates that the frequency of these transfers interfered with her professional development because with each transfer she was required to begin from the start with a new group, with new assignments, and with a new supervisor.  But she presents only her own unsubstantiated statement in support of that theory.  Khan Dep. 39; Khan Aff. ¶¶ 17-18.  Khan has not brought forward any evidence from which a jury could infer that the transfers were anything other than non-adverse, lateral transfers.  Her § 1981 discriminatory transfer claim fails.

B.    *Equipment and Workload*

Khan argues that Lilly discriminated against her by failing to provide her with appropriate lab equipment.  This claim stems from 2000, when Khan was assigned to work in Bob Campbell's group, which was more than four years before

she filed her complaint.  Because there was no automation to assist with set-up on that assay, Khan had to dilute her assays by hand.  Khan Dep. at 31-33.  Khan had to dilute her assays by hand again in 2002, within the four year period before her complaint, when she was assigned to an assay involving a formula that could not be used with the automated equipment.  Khan Dep. 42-43.  Khan's preference for other equipment does not make its unavailability an adverse action.  See *Markel v. Board of Regents of University of Wisconsin System,* 276 F.3d 906, 911-12 (7th Cir. 2002); *Place v. Abbott Lab.*, 215 F.3d 803, 810 (7th Cir. 2000) (holding that the loss of a telephone and cubicle were "too trivial to amount to an adverse employment action").  Khan's assertion that diluting her assays by hand caused her trigger finger and carpal tunnel (conditions that later resolved) fails to rise to the level of an "unsafe" or "unhealthy" change in her workplace environment, particularly here, where Khan has presented no evidence that she ever requested or was denied use of an automated means to dilute her assays.

Khan also complains that she was given a heavier workload than her co-workers and that her comparative workload amounted to discrimination.  Khan has not presented evidence sufficient to support a conclusion that she actually had a heavier workload than her co-workers, let alone that any difference was a product of illegal discrimination.  She testified that she was assigned to five assays while her co-workers were assigned to two or three, but she has no knowledge regarding the possible complexity of those assignments.  Khan Dep. 71.  She asserts that a co-worker commented on her workload, but that comment is

-37-

inadmissible hearsay and not competent evidence on summary judgment.  See Khan Dep. 165-66; Khan Aff. ¶ 29.

Even if Khan had offered actual evidence that she had more, and more difficult, assignments than her co-workers, however, harder work assignments and additional job responsibilities ordinarily are not adverse employment actions, and there is no apparent reason to depart from the usual rule here.  See *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (affirming summary judgment); *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003) (same); *Haugerud v. Amery School Dist.*, 259 F.3d 678, 691-92 (7th Cir. 2001) (same).  Khan's claim that her workload was discriminatory fails.

C.    *Failure to Train*

Khan also asserts that Lilly's failure to train and mentor her adequately amounted to discriminatory treatment.  To be an actionable adverse employment action, a plaintiff alleging failure to train must bring forth evidence sufficient to demonstrate that the plaintiff's preclusion from the training in question resulted in a tangible, negative impact on the plaintiff's employment.  See *Ajayi*, 336 F.3d at 528-29 (plaintiff did not challenge district court's finding that denial of training had no tangible, negative impact on employment); see also *Caskey v. Colgate-Palmolive Co.*, 438 F. Supp. 2d 954, 978 (S.D. Ind. 2006) (granting summary

judgment on similar claim), *appeal pending*, No. 06-2919 (7th Cir.).  Khan fails to make such a showing here.

Much of Khan's argument related to her lack of training and mentoring is based on Khan's own statements regarding her observations that other employees were allowed to go to external conferences and to attend outside educational courses while she was not, that the LOB managers invited her co-workers to lunch but she was never invited to lunch, and that Amy Porter went to the managers' meetings.  Khan Dep. 75-79; Khan Aff. ¶¶ 19-26.  Khan provides no context and makes no attempt to assess the impact that any of these perceived slights might have had on her employment prospects other than to assert vaguely that Lilly's failure to train or mentor Khan "contributed" to her termination.  Pl. Response 27.  Without specific evidence tending to show that the lack of training actually limited Khan's employment, these complaints do not rise to the level of adverse employment actions.  See *Lewis*, 496 F.3d at 653.  She also has presented no evidence linking any of these matters to her race or national origin.  Her § 1981 claim for failure to train and mentor fails accordingly.

D.    *Denial of a Pay Raise/Failure to Promote*

Being on the low end of a pay differential certainly can be an adverse employment action.   See 42 U.S.C. § 2000e-2(a) (Title VII prohibition on discrimination with respect to compensation); 29 U.S.C. § 623(a) (same under

ADEA).  However, Khan has not presented evidence to support a finding that she was paid less than her co-workers.  Her allegation is based solely on her "personal observation" of Lilly's announcement that three of Khan's younger, Caucasian co-workers (Favors, Zink, and Fastenau), who she believes were hired after she was, were promoted while she was not promoted during her five and a half year tenure at Lilly.  Pl. Response 22-23.  She believes that it is "common knowledge" that employees who received a promotion made more money.  Khan Dep. 146.  Survival of a summary judgment motion, however, requires specific facts, not speculation or supposition.  See Fed. R. Civ. P. 56(e)(1).  Khan had ample opportunity to discover and present admissible evidence regarding Favors', Zink's, and Fastenau's salary history.  She failed to do so.  She has not presented even the basic evidence of how much Favors, Zink, and Fastenau were paid upon hire and how much they were paid after they were promoted.  Khan has not even presented evidence of what she herself was paid while she worked at Lilly.  On this presentation, the court need not analyze Khan's discriminatory pay claim under the direct or indirect method.  Under any method, it would be impossible for a jury to infer from the limited evidence Khan has offered that she was the victim of pay discrimination.

In opposing summary judgment, Khan fashioned her discriminatory pay claim as a failure to promote claim.  Regardless of what she calls it, she must present competent evidence to support it.  She puts much emphasis on her performance rating ("satisfactory") and her performance evaluations ("eligible –

based on performance, employee will be considered for merit increase").   Pl.
Response 23.  Although she received positive performance evaluations, Khan has
offered no information regarding Favors', Zink's, or Fastenau's performance
evaluations or ratings.  Again, she has presented nothing here from which a jury
could infer a discriminatory animus under any method of proof, and this claim
under § 1981 cannot survive summary judgment.[8]


IV.   *Khan's Termination*

    A.     *"Mosaic" or Circumstantial Evidence of Discriminatory Discharge Under
           the Direct  Method of Proof*

    Only Khan's claim of discriminatory discharge under Title VII, the ADEA,
and §1981 remains.  Khan relies on both the direct and indirect methods of proof.
As discussed above, Khan can prevail under the direct method of proof by
constructing a "convincing mosaic" of circumstantial evidence.  *Troupe*, 20 F.3d
at 737.   To succeed, the circumstantial evidence must "point directly to a
discriminatory reason for the employer's action" and must be sufficient to allow

---

    [8]Khan's burden at summary judgment is to present competent evidence
from which a jury might reasonably infer discrimination.  In her surreply, Khan
protests that Lilly refused to produce these employees' performance evaluations
in discovery and objected on relevance grounds.  Lilly's stance in discovery does
not absolve Khan of what is ultimately her burden.  If Khan believed she needed
additional discovery, she had ample opportunity to bring that to the court's
attention by way of a motion to compel or in her opening brief.  Waiting until the
surreply is a tactic certain to prolong summary judgment practice even further.
As it was, the court allowed Khan two extra months (a total of three months) to
respond to the motion for summary judgment.  On this record, her argument that
Lilly frustrated her attempt to provide support for her argument is unavailing.

a jury to infer intentional discrimination by the decision-maker. *Adams*, 324 F.3d at 939;  see also *Troupe*, 20 F.3d at 736-37.

The Seventh Circuit has recognized three types of circumstantial evidence that can create the requisite "mosaic of proof" under the direct method, either individually or in combination.  See generally *Troupe*, 20 F.3d at 736-37.  Most commonly, plaintiffs will bring direct evidence by way of suspicious timing, ambiguous statements (oral or written), behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. *Id.*, citing *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 426 (7th Cir. 1992); *Holland v. Jefferson National Life Ins. Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989).  Second, plaintiffs can survive summary judgment using direct evidence by demonstrating that similarly situated employees who were not in the plaintiff's protected class received systematically better treatment in the workplace.  This showing need not be rigorously statistical. See *Troupe*, 20 F.3d at 736.  Third, a plaintiff might show that he or she was qualified for the job but was passed over for or replaced by a similarly situated person not in the protected class, and that the employer's stated reason for the difference in treatment is pretextual. *Id.* at 736.  Khan asserts her intent to proceed under the direct method using circumstantial evidence, but leaves it to the court to construct the "mosaic" on her behalf.

Lilly asserts that Khan has altogether failed to identify circumstantial evidence to support her discriminatory termination claim. Def. Reply 5. The court disagrees. Although Khan's argument using the direct method is fairly opaque, an argument is discernable. In one short section of her brief, Khan discussed her own circumstantial evidence case rather than, as Lilly has put it, "the legal possibility of a case founded on circumstantial evidence." Def. Reply 5. In that section Khan seemed to disavow pursuing her direct evidence case using circumstantial evidence of similarly situated employees, stating that "evidence of similarly situated employees is not required in every case of discrimination," before proceeding to describe generally courts' recognition of the existence of circumstantial evidence. Pl. Response 25.

Khan has presented no evidence of any explicit animus against her or any other employees based on age, race, or national origin. The only circumstantial evidence Khan presents in support of her direct evidence case falls under the description of "bits and pieces," and falls well short of proof of unlawful discrimination. In this regard, she states:

> Lilly argues in one sentence that there is no evidence that Lilly was aware of such behavior, but Lilly knew who was training Khan, and Khan told Lilly that she was trained to do the assays the way that Kahl found objectionable. Kahl also stated that he knew about the use of historical data by Ryan Favors. He also knew about the large amount of erroneous data loaded by Amy Porter, because he told Khan to correct the data. Khan also told Lilly and the EEOC about the other employees. Lilly refused to investigate the other employees.

Pl. Response 25.

For purposes of summary judgment, the court must assume that Lilly knew who trained Khan, knew that Khan was performing her assays as she had been trained, knew that Ryan Favors used historically derived data, knew that Amy Porter loaded erroneous data, and knew that Khan told the EEOC about Favors and Porter.  To withstand a motion for summary judgment, however, the evidence brought forward *must* point *directly* to an unlawful discriminatory reason for the employer's action.  See *Adams*, 324 F.3d at 939; see also *Troupe*, 20 F.3d at 737 (circumstantial evidence must allow a rational trier of fact to infer reasonably that defendant had fired plaintiff because the latter was a member of a protected class). Khan has recited a list of wrongs and declared those wrongs to be circumstantial evidence of unlawful discrimination.  She has not made any connection (direct or otherwise) between those supposed wrongs and a discriminatory animus.  Without that connection, Khan has shown at most that Lilly might have treated her harshly or unfairly.  But she has raised nothing from which a rational trier of fact could infer Lilly's motive was illegal discrimination without resorting to unsupported speculation.  The court need not and should not invent such a connection or engage in speculation on Khan's behalf.  Her direct evidence case fails.

B.     *Discriminatory Discharge Under the Indirect Method of Proof*

Khan also attempts to prove discrimination with the indirect method of proof. Khan's indirect evidence case fails because Khan has not brought forward evidence that similarly situated employees received more favorable treatment than she did. Even if Khan were able to establish a prima facie case, she has not offered evidence that Lilly's legitimate, non-discriminatory reason for her discharge (data falsification) was a pretext.

### 1.    *Similarly Situated Employees*

Employees are "similarly situated" to a plaintiff if the two employees dealt with the same supervisor, were subject to the same standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. See *Snipes v. Illinois Dep't of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002); *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000). This component of a court's analysis "is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees – distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions." *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *cert. granted on other grounds*, 128 S. Ct. 30 (2007). The court must answer the question "whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an

inference of discrimination." *Id.*  Khan contends that two of her co-workers, Amy Porter and Ryan Favors, were similarly situated to her but were not disciplined for their transgressions.  Pl. Response 28.

        a.     *Amy Porter*

Khan asserts that Amy Porter was situated similarly to her because Kahl once asked Khan to redo "the large amount of erroneous data that had been done by Amy Porter."  Pl. Response at 28; Khan Dep. 72.  Khan testified that she was not sure what the problems with Amy Porter's data were or what had caused the problems, and she never spoke to Kahl about the situation.  Khan Dep. 122-23, 137-38.  Kahl confirmed that Amy Porter had made mistakes in analyzing assay results.  Kahl Aff. ¶ 36.  However, to his knowledge, Porter had not altered raw data and had fully documented her work.  Kahl Aff. ¶ 36.

What little Khan is able to state concerning the research practices and procedures of Amy Porter is insufficient to raise a genuine issue of material fact, and will not defeat Lilly's motion for summary judgment.  Khan asserts that Amy Porter uploaded erroneous data, but she admitted that she was not sure what the errors were or why they had occurred.  At a minimum, evidence presented, whether at the summary judgment stage or at trial, must be based on or supported by a witness' personal knowledge.  See Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 602 ("A witness may not testify to a matter unless evidence is introduced

sufficient to support a finding that the witness has personal knowledge of the matter"); *United States v. Global Distributors, Inc.*, 498 F.3d 613, 619 (7th Cir. 2007) ("Although testimony alone can defeat summary judgment motions in some cases, asserting a conclusion is no substitute for detail where detail is needed to support a claim."). Although personal knowledge may include reasonable inferences, those inferences must be "grounded in observation of other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003), quoting *Visser v. Packer Eng'g Assoc.*, 924 F.2d 655, 659 (7th Cir. 1991).

Here, Khan admitted that although she was tasked to redo Porter's work, she had no idea what caused the underlying errors in Porter's assays. She has no ground on which she can testify with personal knowledge regarding any similarities between how Porter and she conducted their respective research assignments and analyses without resorting to speculation. Khan presents no other evidence to support her assertion that Porter's behavior was similar to hers. She has failed to raise a genuine issue of material fact.

Even if the question of the admissibility of Khan's statements were set aside momentarily, Khan has failed to come forward with evidence of sufficient commonality between herself and Porter for a jury to reach an inference of discrimination. Employees are "similarly situated" only if they engaged in similar

conduct.  See *Snipes*, 291 F.3d at 463.  Here, the undisputed facts show that Lilly had good reason to distinguish Porter's infractions from Khan's infractions.  Kahl believed that Porter had made mistakes in analyzing assay results but had not altered raw data and had fully documented her work.  Kahl Aff. ¶ 36.[9]  In comparison, Khan did not make mistakes.  She ran her assays but copied control data from one run to another, purposely analyzing and reporting the copied data as though it was the raw data.  As Kahl explained:  "A number of subjective choices must be made when analyzing assay data.  Therefore, mistakes . . . are expected and are typically not cause for discipline or discharge.  Falsification of raw data, on the other hand, renders all subsequent analysis and study unreliable and is intolerable from a scientific standpoint."  Kahl Aff. ¶ 37.  On this record, Porter's mistakes cannot be compared to Khan's deliberate analysis and reporting of changed data.  After all, controls are supposed to be used for control.  If the results for controls in an experiment indicate failure, that fact is critical and should not be concealed from the people who must evaluate the significance of the results.  As a matter of law on this record, Porter and Khan are not similarly situated.

b.    *Ryan Favors*

---

[9]Khan cannot dispute Kahl's description of what Porter did because she admitted she has no idea what Porter did, and she has raised no other evidence to call into doubt Kahl's assessment of Porter's activities.

Khan also contends that Ryan Favors engaged in similar conduct and thus is similarly situated to her.  In support of this argument, Khan brings forward something she learned from one of her co-workers, Saba Husain.  Saba Husain, apparently, learned her information from another co-worker, Anju Patel.  Patel told Husain, and Husain told Khan, that Favors pulled historical data for the positive control on his assays.  Khan Dep. 88-90.  Khan's testimony about this episode is doubly inadmissible as double hearsay.  See *Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); *Logan v. Caterpillar, Inc.*, 246 F.3d 912, 925 (7th Cir. 2001) (unsupported hearsay statement insufficient to preclude summary judgment); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) ("a party may not rely upon inadmissible hearsay in an affidavit or deposition to oppose a motion for summary judgment").

Kahl's testimony on the episode is not hearsay, and Khan may rely upon it, but his testimony is not sufficient to support a finding that Khan and Powers were similarly situated.  Kahl confirmed that Ryan Favors indeed had used a historically derived constant value in a calculation as part of his assay data.  Kahl Dep. 120-23; Kahl Aff. ¶ 35.  Favors took a daily average of the agonist control and used that average as a constant divisor when he was analyzing raw data.  Kahl Dep. 121-22, 124.  This was not the method Kahl preferred, but Favors' method was scientifically acceptable, and to Kahl's knowledge Favors never altered raw data and fully documented his work.  Kahl Aff. ¶ 35.  Unlike Khan, Favors did not change the values in any column of an assay plate.  Kahl Dep. 121.  Kahl

distinguished Favors' tendency of using an alternate means of analysis from what Khan had done.  Kahl Aff. ¶ 37.  Favors' practice was "expected" and not cause for discipline, while Khan's practice rendered "all subsequent analysis and study unreliable" and was "intolerable from a scientific standpoint."  *Id.*  Favors' choice of a different methodology cannot reasonably be compared with Khan's deliberate reporting of false control data that undermined the integrity of the experimental results.  As a matter of law, Khan has not shown that she and Favors "engaged in similar conduct" sufficient to call Favors similarly situated to Khan.  In the absence of evidence that Lilly treated Khan more harshly than it treated similarly situated employees who were younger or of non-Asian heritage, Khan's  prima facie case of discriminatory termination fails under Title VII, the ADEA, and § 1981.

2.      *Pretext*

Even if Khan had offered a prima facie case, Lilly has come forward with a legitimate, non-discriminatory reason for Khan's discharge – data falsification – and argues that Khan has not offered evidence that this reason was a pretext for discrimination.  Def. Br. at 19.  To show pretext, Khan would have to present evidence sufficient to allow a reasonable jury to find that Lilly did not honestly believe the reason it gave for her termination, and that instead Lilly's reason was a lie.  See *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 419 (7th Cir. 2006); *Russell*, 51 F.3d at 68.  The focus of a pretext inquiry is whether the employer's reason is honest, not whether it is accurate, wise, or well-considered.   See *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006).  To demonstrate a material issue of fact as to pretext, Khan would have to offer evidence that would allow a reasonable jury to find (1) that it is more likely that a discriminatory reason motivated Lilly than its proffered non-discriminatory reason or (2) that Lilly's explanation is not credible.  *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004), citing *Guerrero v. Ashcroft*, 253 F.3d 309, 313 (7th Cir. 2001).

Khan may not prove pretext with her subjective belief that she is a victim of discrimination.  Khan must point to specific facts and avoid "engag[ing] in nothing but supposition and conjecture in an attempt to build" her case of discrimination because her subjective beliefs, "no matter how genuine, cannot be the sole basis for a finding of discrimination."  *Kizer v. Children's Learning Center*,

962 F.2d 608, 613 (7th Cir. 1992); see also *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739-40 (7th Cir. 2006) (in a plaintiff's attempt to demonstrate pretext, "it is axiomatic . . . that a plaintiff's conclusory statements do not create an issue of fact").   The court does "not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of that decision.   Our only concern is whether the legitimate reason provided by the employer is in fact that true one." *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004).

Khan asserts repeatedly that much of what Lilly said and did concerning her termination was a "lie."   She claims that the term Lilly used to describe what Khan had done (data "falsification") was a lie, that Lilly's assertion that Khan altered raw data was a lie, and that Lilly lied in stating that Khan admitted at the time of her termination and on summary judgment that she had altered raw data.   Pl. Response 3, 6, 12-13.   She states that Lilly's assertion that Khan's behavior rendered the data unreliable is "not true." Pl. Response 29.[10]   Merely accusing Lilly of lying is not enough.   Khan must offer admissible evidence sufficient to

---

[10]Khan also asserts that Lilly lied to the EEOC when it told the EEOC that Khan had been coached and given a course regarding what was and was not an appropriate laboratory practice, and that Lilly lied when it said that Khan ignored a warning from her supervisor.   Pl. Response 3, 4, 28-29, 31; Pl. Surreply 19-20. These disputes are not material to what Lilly believed or did not believe at the time of Khan's termination regarding whether or not she had falsified data and so these accusations have little bearing on whether that explanation was a pretext for illegal discrimination.   In any event, because Khan has failed to establish a prima facie case, she still could not avoid summary judgment even if these facts were deemed material to the pretext issue.

support an inference that Lilly did not honestly believe that she had committed data falsification and instead terminated her because of an illegal motive.

Khan argues that she did not falsify raw data, that she copied data from one plate to another without concealing or altering the original results.  Pl. Response 30.  Khan and Lilly may disagree on the semantics, but they agree on the mechanics.  When Khan observed that the Column 12 values of a plate had failed, she left that data in the Trilux and copied Column 12 values from another plate for analysis in ABase.  Column 12 was a known compound that served as the control to "normalize" the results from the assay plates.  Khan believed that since Column 12 consisted of only known compounds, there was nothing wrong with copying them from plate to plate where one set of Column 12 values failed.  Khan's supervisor, Kahl, did see something wrong with this practice and called it "data falsification."  Khan called her practice "copying" and "correcting" the failed control values.  The parties' terminology and Khan's motives are not relevant to the court's pretext analysis.  Regardless of the words used to describe what Khan was doing or why she was doing it, Khan has presented no *evidence* sufficient to allow a reasonable jury to find that Lilly did not honestly believe that Khan's practice amounted to data falsification.  Controls are for the purpose of control.  If the control fails, a person evaluating the results of the experiment needs to know that it failed.  Without a showing that Lilly did not honestly believe her actions were falsification of data, this court is not in a position to second-guess Lilly's determination that Khan's termination was warranted.

Khan asserts that she was only doing what she had been trained to do. In particular, Khan "was told that in those few cases of obvious malfunction, to correct the outliers for the known substance in Column 12 with the data from the same known substance in the same run," and was never told differently "until Lilly terminated her and accused her of the worst offense a scientist can be accused of, falsification."[11]  Pl. Response 29-30.   She fails, however, to articulate how this amounts to evidence of pretext. Although Khan asserts that "there is no evidence that Khan did not honestly believe that she was following Lilly's instructions," Pl. Response 30, what Khan believed is not pertinent to a pretext analysis. The issue is whether *Lilly* honestly believed the reason it gave for Khan's termination. For purposes of summary judgment the court must view the facts in a light most favorable to Khan, and thus must assume that Khan was trained poorly or improperly. Upon that assumption, her questionable training may explain why she did what she did. Even so, Khan's poor training does not cast doubt on Kahl's (and, by extension, Lilly's) honest belief that Khan's research methodology amounted to data falsification and deserved termination.

Khan contends that Lilly's failure to investigate the research practices of her co-workers and trainers is evidence of pretext. It is difficult to comprehend how

---

[11]In this portion of her Response brief, Khan presents arguments regarding the similarly-situated prong of her indirect evidence case, not pretext. The court reads it as a pretext argument, however, as she makes a similar, though more abbreviated argument in that section of her brief: "Khan followed the instructions of the employees that Lilly had train her. Lilly did not train Khan differently. Lilly did not do anything to the other employees." Pl. Response 31.

this "failure" could amount to pretext when Lilly had no indication that other employees had falsified data, and Khan repeatedly refused to name the individuals she claimed to have observed engaging in similar practices, making an investigation difficult if not impossible.  Khan Dep. 102, 127-28, 141-43.[12]  After Khan's termination, Kahl guessed that Khan referred to Amy Porter and Ryan Favors when she accused her co-workers of loading erroneous data and using historical variables.  Kahl believed that Porter and Favors had not falsified data as he believed Khan had, for reasons explained above.  An investigation was not necessary.  Khan has presented no evidence that Kahl's determination was in error, much less that it amounted to a "lie" sufficient to infer pretext.

Khan also argues that pretext is demonstrated by the fact that Lilly issued guidelines and offered training concerning proper data analysis techniques only after Khan was terminated.  Pl. Response 31.  However, the undisputed evidence shows that the guidelines and training course related to analyzing outliers in the data, not changing or substituting data for the raw values in instances when the raw value indicates the control has failed.  Pl. Response 31; Kahl Dep. 44-46.  Moreover, Khan testified that she did not know why Lilly instituted the guidelines.  Khan Dep. 114-15.  She also contends that Kahl did not give her any training, warning, formal coaching, time off without pay, probation, or other discipline before terminating her.  Pl. Response 31.  Essentially, this is an argument that

---

[12]As discussed above, though Khan believes otherwise, she has presented no admissible evidence sufficient to support her underlying assumption that Porter or Favors falsified data.

Lilly overreacted to her behavior, not that Lilly fired her under false pretenses, and is not evidence of pretext.  See *Fane*, 480 F.3d at 541.

Khan argues that "shifting reasons are evidence of pretext," citing *Rudin v. Lincoln Land Community College*, 420 F.3d 712 (7th Cir. 2005), and *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 710-11 (7th Cir. 2004).  *Rudin* and *Harvey* make clear, however, that the "shifting reasons" at issue are the employer's reasons for the challenged employment decision.  See *Rudin*, 420 F.3d at 726-27; *Harvey*, 377 F.3d at 710-11 (employer's failure to produce evidence supporting its reasons for demoting plaintiff entitled the jury to disregard those justifications as unworthy of belief).  Khan has presented no evidence to show that Lilly's reason for terminating Khan – data falsification – has ever wavered.  Lilly's reason has not shifted, and Khan has not brought forward evidence sufficient to demonstrate that its reason was pretext.

*Conclusion*

Khan may disagree with Lilly's assessment that what she did amounted to "data falsification," but she has no evidence that Lilly's decision was based in any way on her age, race, or national origin.  Lilly's motion for summary judgment is granted, and the court will enter final judgment accordingly.


So ordered.

Date:  March 27, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana


Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Joseph C. Pettygrove
BAKER & DANIELS
joseph.pettygrove@bakerd.com